STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| **Newton Subdivision & PUD** | } | **Docket No. 60-3-05 Vtec** |
| (Appeal of Hathorn) | } | |
|  | } | |

## Decision on Cross Motions for Summary Judgment

Byron Hawthorn (Appellant) appealed from the decision of the Town of Thetford (Town) Planning Commission and Zoning Board of Adjustment (ZBA) dated February 22, 2005, granting final approval to Donald and Joyce A. Newton (Appellee-Applicants) for a seven-lot subdivision/planned unit development (PUD) located at 6925 Vermont Route 5, in North Thetford. Appellant is represented by C. Daniel Hershenson, Esq.; Appellee-Applicants are represented by Paul Gillies, Esq. Now pending before this Court are cross motions for summary judgment.

## Factual Background

The following facts are undisputed unless otherwise noted:

1.     On May 14, 1997, Appellee-Applicants acquired 14.4 acres of land (the "parcel") located at 6925 Vermont Route 5, westerly of Vermont Route 5 and southerly Vermont Route 244, in the Rural-Residential district of the Town of Thetford.

2.     The parcel is improved with three residences and several storage sheds.

3.     The residences are served by on-site water and septic systems.

4.     Prior to June 24, 2004, the Newtons submitted a subdivision application for the creation of three lots, with lot sizes of 5.0 acres, 4.4 acres, and 5.0 acres.

5.     Prior to January 7, 2005, the Newtons either amended their initial application or submitted a new application to subdivide the parcel into seven lots as a PUD.

1

6. The proposed seven-lot subdivision/PUD is configured as follows: Lot 1 would contain one as yet unbuilt single family dwelling; Lot 2 would contain one as yet unbuilt commercial/retail facility; Lot 3 would be preserved as open space; Lot 4 would continue as a site for a "storage facility" and would contain the existing storage sheds; and Lots 5, 6, and 7 would each contain one of the pre-existing residences with their associated pre-existing on-site water and septic systems.

7. On February 22, 2005, a decision was apparently jointly issued by the Town Planning Commission and ZBA.[1]

8. On March 24, 2005, Appellant timely filed his notice of appeal with this Court from the February 22, 2005, decision.

9. On June 30, 2005, Appellee-Applicants received wastewater system and potable water supply permit No. WW-3-9673 from the Department of Environmental Conservation of the Vermont Agency of Natural Resources (ANR). This ANR permit approved the seven-lot subdivision/PUD, with conditions, including the condition that approval of Lots 3 and 4 was deferred.

## Discussion

Appellee-Applicants have moved the Court for summary judgment, seeking the dismissal of nine of the seventeen questions in Appellant's Statement of Questions, specifically Questions 1, 9, 10, 11, 12, 13, 14, 16, and 17. Appellant opposes Appellee-Applicants' motion, and moves for summary judgment on Questions 12, 16, and 17. Appellee-Applicants oppose the latter motion as well. The parties' filings reveal that some material facts are agreed upon, and some remain in dispute.

---

[1] The Court has not yet received a copy of the February 22, 2005, Decision. We request that Appellee-Applicants immediately file a copy of that Decision, so that the Court may determine whether there are factual determinations or legal conclusions that were not appealed from.

The questions presented by the parties' multiple filings raise overlapping issues that are relevant to the proposed subdivision and development. We have created the following categories for the issues raised, for sake of clarity.

## A.) Completeness of application.

Questions 1 and 10 essentially ask whether the application was complete. Appellee-Applicants ask this Court to dismiss Questions 1 and 10, asserting that "Thetford's subdivision regulations explain what is required for a major subdivision [and] . . . . [a]ll of that material was submitted [in the application and plat[2]]," Appellee-Applicants' Mot. for Summ. J. at 2. Appellant responds that the application "lacks numerous items required by the subdivision and PUD regulations," Appellant's Mem. in Support of his Mot. for Summ. J. at 15, including items required to be submitted with the preliminary plat under Subdivision Regulations (Subdivision) §§ 6.08(E) and 6.08(J), a soil survey plan showing soil mapping units and boundaries as required by Subdivision §§ 6.08(J) and 6.14(B)(2), and the proposed method of sewage disposal for Lots 2, 3, and 4 as required by Zoning Ordinance (Zoning) § 395(8)(c).

Major subdivisions, such as this one, require both preliminary and final plat approval. The application for preliminary approval "shall be accompanied by all information described in Section 6.08," pursuant to Subdivision § 3.04, including "[s]oil mapping units and unit boundaries [and] . . . . [s]ewage disposal information as required under Section 6.14," Subdivision § 6.08(J). Section 6.14 relates to on-site sewage disposal and requires the subdivider to provide detailed soil survey information, Subdivision § 6.14(B)(2).

The parties dispute whether the application contains all the required information, but it appears that at least the soil mapping units and unit boundaries are

---

[2] The reproduction of the plat provided to the Court with the application is mostly illegible due to size reduction and low resolution. We are unable to determine exactly what the plat shows. We ask that Appellee-Applicants provide the Court and Appellant with a clean copy of this plat.

missing from the application materials. In this de novo proceeding, Appellee-Applicants will have the opportunity to supplement their application materials with any information that may have been lacking when the application was presented to the Planning Commission and ZBA. While Questions 1 and 10 turn on disputed facts, and therefore are not appropriate for summary judgment, Appellee-Applicant will bear the burden of showing compliance with the informational requirements of Subdivision § 6.08 and other applicable sections of the Regulations and Ordinance at or prior to the merits hearing.

**B.) Conformance with statutory provisions.**

Question 9 asks: "Whether the project as proposed is in compliance with Title 24 V.S.A. § 4407(12), 4417 (amended), 4418 (amended) and 4413." The provisions of 24 V.S.A. § 4413 have no bearing on the issues in this appeal. That part of Question 9 relating to § 4413 is therefore dismissed.

Section 4407 was repealed on June 30, 2004. Appellee-Applicants' original application for a three-lot subdivision was submitted prior to June 20, 2004; that application was therefore governed by § 4407. Between June 20, 2004, and January 7, 2005, Appellee-Applicants either amended their original application to include seven lots, or submitted a new application for a seven-lot subdivision/PUD. Appellant argues that if the seven-lot subdivision/PUD is an amendment to the original application, then § 4407(12) applies. Appellant argues in the alternative that if the Court determines that a new application was filed after June 30, 2004, then § 4417 applies.

The question of whether § 4407(12) or § 4417 applies to the application is of no great import, because both sections provide a municipality with similar authority to authorize planned unit developments.[3] See the former § 4407(12) ("Any municipality

---

[3] To the extent that a distinction between § 4407 and § 4417 is important, we hold as a matter of law that the application for a seven-lot subdivision/PUD is a new application governed by § 4417, and not an amendment to the application for a three-lot subdivision, because an application under the PUD

4

may adopt zoning regulations providing for planned unit developments") as compared to the current § 4417(a) ("Any municipality adopting a bylaws should provide for planned unit developments to permit flexibility in the application of land development regulations"). Thetford's zoning ordinance, which was last amended in 1999, provides for planned unit developments at § 395, stating that "in order to encourage flexibility . . . the Planning Commission shall encourage and support an owner . . . to develop the tract as a . . . Planned Unit Development."

Both 24 V.S.A. § 4417 and § 4418 are enabling laws; § 4417 encourages municipalities to adopt bylaws providing for planned unit developments, and § 4418 grants municipalities the authority to regulate subdivisions by adopting subdivision bylaws. The question before us on appeal is not whether the project is in compliance with the state statutes authorizing local regulations, but whether the local regulations are valid and whether the project is in compliance with those local regulations. That part of Appellee-Applicants' motion seeking dismissal of Question 9 should therefore be granted.

## C.    Minimum lot sizes.

Appellant asks in Question 11:

Whether the project as applied for in the rural residential zoning district justifies the waiver of the district minimum lot size requirements of one dwelling unit per 80,000 square feet per lot by authorizing the creation of seven separate lots of which five lots would be less than the 80,000 square foot minimum lot requirement.

Planned unit development bylaws authorize "uses, densities, and intensities that do not correspond with or are not otherwise expressly permitted by the bylaws for the area in which a planned unit development is located . . . ," 24 V.S.A. § 4417(d). See also Anderson's American Law of Zoning, stating that "planned unit development permits

---

regulations combines zoning and subdivision review, and is thus qualitatively different than an application under subdivision regulations alone.

the inclusion of a variety of housing types, lot sizes, and even nonresidential uses on a single tract," 2 K. Young, ANDERSON'S AMERICAN LAW OF ZONING § 11.14 (4th ed. 1996); and that planned unit development "is intended to bring an element of flexibility into an otherwise rigid system of [zoning] controls," id. at § 11.15.

Appellant argues that while the statute authorizes deviations from "uses, densities, and intensities," 24 V.S.A. § 4417(d), it does not expressly allow for deviations from the minimum lot size in the zoning district surrounding the PUD. This argument is unavailing. As noted above, the purpose of PUD regulations is to allow for flexibility of otherwise rigid land use controls. Planned unit development bylaws allow the Town to "vary the requirements of the zoning ordinance," In re Taft Corners Associates, Inc., 171 Vt. 135, 138 n.3 (2000). Lot size is one of the requirements that may be varied in a planned unit development in Thetford, pursuant to Subdivision § 6.13(B), which provides that:

> All lots shown on the final plat must conform to the minimum area and dimension requirements of the Zoning Ordinance if one exists. However, if allowed in the zoning regulations, a subdivision plat may be designed for cluster or planned unit development, provided all requirements of these and such zoning regulations are met.

The Town zoning regulations also anticipate and authorize development in which "undersized" lots may be permitted, via the language of Zoning § 395(5):

> Density may vary with development. The total permitted number of dwelling units may be allowed to exceed the number which could be permitted . . . if the land were subdivided into lots in conformance with the zoning regulations for the district in which the land is situated, however, in no case shall the density, as measured in dwelling units per acre, be greater than 20% more than the density that would be allowed using a conventional development pattern.

The proposed seven-lot PUD is situated within the Rural Residential district. The Zoning Ordinance provides a schedule of area and bulk requirements for planned residential developments (PRDs), "Schedule B" appearing at the end § 395. Schedule B

6

provides that the "<u>overall</u> density of development" in the Rural Residential district shall be one dwelling unit per 80,000 square feet (emphasis added). Section 395(5) allows for a density reduction of no more than 20% when a PUD is proposed, but that bonus is not needed here to approve the application. The proposed project area is 14.4 acres, or 627,264 square feet, which equates to a capability of the original parcel accommodating up to seven lots. Thus, even though five of the lots are less than 80,000 square feet in area, the overall density is well within the allowed limits. Appellee-Applicants' motion seeking dismissal of Question 11 should therefore be granted, as density variation is specifically allowed under Zoning § 395(5).[4]

### D.)    Approved septic system designs.

Question 12 asks: "Whether the project as proposed can be approved where three of the proposed lots (2, 3 and 4) do not have approved septic systems and where final design plans for said systems have not been submitted as part of the application." The application for the seven-lot subdivision/PUD[5] lists Lots 2, 3, and 4 as "Water and Sewer systems deferred."

Section 395(8)(c) of the Zoning Ordinance states that every proposal for a PUD "shall include . . . information which describes the proposed method of water supply and sewage disposal." Appellee-Applicants' proposal contains no such information for Lots 2, 3, and 4, and thus is not complete. However, as this is a de novo proceeding, Appellee-Applicants will have the opportunity to correct this deficiency prior to a hearing on the merits of their application.

Appellee-Applicants have received an ANR wastewater system and potable water supply permit. The state permit restricted development on Lots 3 and 4, and

---

[4] See also Zoning § 493 ("Lot size averaging is permitted to allow flexibility of design and to encourage a mix of lot sizes . . . provided that land equal in area to the difference between the proposed lot and the minimum lot size is restricted from development . . . through the grant of a conservation easement to the Town or to a conservation organization approved by the Planning Commission.").

[5] See Section (c) titled "Proposed Method of Water and Sewer."

required any deed for these parcels to include a statement[6] that "this lot may not be able to meet state standards for a potable water supply or wastewater disposal system and therefore this lot may not be able to be improved."

The state permit approved Lot 2 for the construction of an office building with a maximum of eight employees. In deciding to issue the state permit, ANR relied on Appellee-Applicants' "Overall Site Plan" dated June 20, 2004 and revised June 28, 2005; and on Appellee-Applicants' "Septic System Design" dated April 5, 2004. These plans included soil boring and percolation testing data, but it is unclear whether that data constitutes a "soil survey report and plan" as required under Subdivision § 6.14(B)(2).

A closer look at the proposed uses for Lots 3 and 4 reveals why a septic system design was not prepared. Appellee-Applicants' propose to preserve Lot 3 as open space held in common for the benefit of the other six lots. Proposed uses on Lot 3 will be limited to passive recreation, gardening, and other agricultural uses. Lot 3 will not be served by a septic system, as the use proposed does not require one. Likewise, Lot 4 is proposed for commercial use and would contain the existing storage sheds, a use for which no septic system is required. The state permit requires that notice be given to potential purchasers of Lots 3 and 4 that development requiring a septic or water system may not be possible. The fact that Lots 3 and 4 do not have an approved septic system is no barrier to approval of the application when no septic system would be required for the use proposed for those lots, but information regarding the proposed (lack of) a system must be included in the application, pursuant to Zoning § 395(8)(c).

Lot 2 is proposed for commercial use, and has received a state permit, as noted above. But in order for Appellees' application to be in compliance with the Town subdivision and zoning regulations, information describing the water and septic system for Lot 2 must be included in the application. If Appellee-Applicants wish to

---

[6] This statement mirrors language that was often referred to as "deferral language."

incorporate their state permit into their PUD application, they must do so explicitly, see Appeal of Green Meadows Center, LLC, Docket No 208-12-01 Vtec (Vt. Envtl. Ct., Dec. 19, 2002), slip op. at 3 ("if the Applicant proposes to incorporate its Act 250 permit into its PUD application, it must do so explicitly.").

Since compliance with the Town regulations is lacking, at this point, on the septic design issues for Lots 2, 3, and 4, Appellee-Applicants' motion seeking dismissal of Question 12 must be denied. But Appellant's motion for summary judgment on Question 12 should likewise be denied as premature, with an opportunity to renew if Appellee-Applicants are unable or unwilling to correct these deficiencies in their application.

**E.)    Use restrictions.**

Question 13 asks: "Whether the project as proposed can be approved if it results in a predominant use of land which is substantially different from the uses permitted in the district in which the project is located."

Appellee-Applicants propose both residential and commercial uses on the PUD. Appellant apparently believes that such a mixed use is prohibited by the zoning ordinance. He is mistaken. A PUD is a conditional use in the Rural Residential district, "subject to the provisions of section 395," which states in subsection (5) that, in a PRD or PUD:

> The predominant use of the land shall not differ substantially from the uses permitted in the district in which the plan is located. In a PUD in a residential district, commercial, educational and public facilities may be allowed which are designed to serve the development and the area around the development.

Zoning § 395(5).

The proposed residential uses of Lots 1, 5, 6, and 7 are consistent with the permitted residential use in the district. As this permitted use is proposed on four of the seven lots, it is the predominant use of the land, and the proposed commercial uses

9

are subordinate. This allocation of the combined uses is reinforced by analyzing the lot usage by acreage: 6.48± acres will be devoted to residential use, 5.75± acres will remain as undeveloped common land, adjoining the residential lots, and only 2.2± acres will be devoted to commercial use. The proposed PUD thus complies with Zoning § 395(5). Appellee-Applicants' motion seeking dismissal of Question 13 should therefore be granted.[7]

## F.)    Nonconformities.

Question 14 asks: "Whether the creation of lots which do not conform to the Zoning Ordinance is permissible pursuant to § 721 of the Zoning Ordinance where said lots would result in a new violation of said ordinance with regard to pre-existing non-conforming structures." Section 721 states "[a]ny lawful non-conforming building or structure in existence at the time of passage of this ordinance may continue unchanged, but may not be altered or expanded in any way which will result in a new or increased violation, except as provided herein."

It is undisputed that the 14.4 acre lot as it currently exists is non-conforming, but the parties are in dispute as to whether the existing structures predate the Town's adoption of zoning.[8] Appellant argues that "[c]onverting multiple structures on a single lot into structures on multiple subsized lots creates, by definition, a new violation," Appellant's Mem. in Support of his Mot. for Summ. J. at 21. However, the proposed "subsized" lots will not constitute a new zoning violation if they comply with the PUD

---

[7] We note that the Zoning Ordinance states that the "general purpose" of the Rural Residential district "shall be . . . [t]o maintain a low density rural character primarily as a district of farms, residences and woodlands." The approval of PUDs (and PRDs) in the Rural Residential district, with their higher densities, may eventually frustrate this general purpose. However, that concern is best addressed by the Town in its Town Plan, and does not appear to have a bearing on this application.

[8] Appellant asserts that "it is uncertain" whether the structures (three houses and several storage sheds) predate zoning, but Appellee-Applicants represent that "the house and sheds were constructed before 1972 (one in the 1950's, second in 1969), before zoning, and thus are grandfathered." Appellee-Applicants' assertion does not account for all three residences, so to the extent that this issue proves to be a material one, we expect that the evidence offered at trial will clarify it.

regulations in Zoning § 395, as discussed above. Lots within a PUD meeting the requirements of § 395 do conform to the Zoning Ordinance. Therefore, Appellee-Applicants' motion seeking dismissal of Question 14 should be granted.

## G.)     Selectboard review.

Question 16 asks: "Whether § 490 of the Zoning Ordinance allows the reduction in minimum lot area where, as in this application, onsite water and sewage systems are proposed."[9]   Section 490 states that where on-site water and sewage systems are proposed, the minimum lot area must be approved by the Board of Selectmen, and "shall not be less that that required for the district in which the use is to be located."

Appellee-Applicants argue that the required lot area in this case is not the 80,000 square feet required in the Rural Residential district, but rather any lot area allowed under either the PUD regulations or the lot size averaging provision of Zoning § 493. Appellant notes that adequate disposal of sewage is a vital matter of public health, and argues that the 80,000 square foot minimum is an absolute floor in the Rural Residential district where on-site water and sewage systems are proposed. Allowing lots with on-site sewage to comply with the more flexible PUD or lot averaging area requirements,

---

[9]  As both this Question and Question 17 turn on the interpretation of Zoning Ordinance § 490, we quote that section full here:

> Where on-site water and sewage systems are used in place of public or approved private off-site water and/or sewage facilities, the minimum lot area, width and depth shall be subject to approval of the Board of Selectmen, but shall not be less than that required for the district in which the use is to be located. When doubt exists with the Board of Selectmen as to the adequacy of the soil structure of the lot to properly accommodate an on-site water and/or sewage system, the Board of Selectmen may require the property owner to obtain an opinion from a registered engineer as to the size of the lot required for an on-site water and/or sewage system to operate on the lot according to recommended Health Regulations of the Vermont Department of Health. If the findings of the engineer indicate that larger lots are necessary, the Board of Selectmen may require a lot size in excess of the minimum required for that zoning district in which the lot or lots is located.

Zoning § 490.

Appellant implies, would result in the approval of lots with insufficient area for a properly functioning sewage system.

The lot area required here is the area required by the subdivision and zoning regulations when the relevant provisions are read in harmony and with reference to each other. Since the relevant regulations provide for flexibility in lot area when a PUD is proposed, the "required" lot area for lots in a PUD is not the 80,000 square foot minimum set out in Schedule A, but a variable area, that is subject to ZBA approval in the first instance and review by this Court when an appeal is taken.

Where, as here, on-site sewage and water systems are proposed, approval by the Selectboard is required pursuant to Zoning § 490.[10] However, we read that ordinance provision, as applied here, as providing the Selectboard with discretion to determine whether the lots permitted through the PUD approval process are sufficient in size and dimension to accommodate the proposed on-site waste disposal systems. Appellee-Applicants' motion seeking to dismiss Question 16 should therefore be granted, and Appellant's motion for summary judgment on this same Question should be denied.[11]

Question 17 causes us to look at issues similar to Question 16. The former Question asks:

> Whether a planned unit development or major subdivision approval can be granted where the proposed subdivision proposes onsite water and sewage systems and lots which do not meet the minimum lot area requirements of the Zoning Ordinance without evidence that said minimum lot areas have been approved by the Board of Selectmen pursuant to § 490 of the Zoning Ordinance.

---

[10] The requirement that the Selectboard approve the lot dimensions serves to prevent the approval of lots that are not large enough to adequately dispose of waste via an on-site sewage disposal system. The Thetford Selectboard, as in many Vermont municipalities, presumably also serves as the Town sewer commissioners.

[11] Our analysis here actually results in Appellant's Question 16 being answered in the affirmative: that is that, depending upon the completeness of the evidence Appellee-Applicants present at trial, § 490 "allows [for] the reduction in minimum lot area where, as in this application, onsite water and sewer systems are proposed." While we are answering Appellant's Question in the Affirmative, our analysis also leads us to grant Appellee-Applicant summary judgment on this issue.

Section 490 explicitly requires approval of lot dimensions by the Selectboard when on-site sewage and water systems are proposed. Appellee-Applicants "recognize that this is [their] responsibility," but argue that an appeal of a PUD decision does not involve § 490. Appellee-Applicants assure the Court that "[b]y the time this matter is heard by the Court, that requirement [of Selectboard approval under § 490] will be fulfilled," but assert that Selectboard approval is not a prerequisite to Planning Commission approval of a PUD application. However, Subdivision § 6.14(B)(1) states that "[w]here individual, on-lot sewage systems are proposed . . . [n]o subdivision of land will be approved by the Commission where it creates a lot or site that will not meet the minimum standards and design requirements imposed by . . . municipal regulations." Section 490 imposes a minimum standard regarding lot size, consisting of that lot size determined by the Selectboard to be adequate to properly accommodate an on-site water and/or sewage system. As the Selectboard has not yet made that determination, the application was deficient and the Planning Commission's approval of the PUD was premature.

As noted in the discussion of Questions 1 and 10, Appellee-Applicants have the opportunity in this de novo proceeding to correct deficiencies in their application. Since Appellee-Applicants' are confident that Selectboard approval will be secured before a merits hearing, this Court will be able do what the Planning Commission could not: determine under Subdivision § 6.14(B)(1) whether the lots meet the requirements imposed in connection with the Selectboard review under Zoning § 490. We therefore answer Appellant's Question 17 in the negative and await Appellee-Applicants' evidentiary offerings at trial regarding compliance with § 490.

Accordingly, based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that Appellant's Motion for Summary Judgment on Question 12 is **DENIED**, but with an opportunity to renew if Appellee-Applicants fail to provide information which

13

describes the proposed method of water supply and sewage disposal on Lots 2, 3, and 4; Appellant's Motion for Summary Judgment on Question 16 is **DENIED**; and Appellant's Motion for Summary Judgment on Question 17 is **GRANTED**.

Appellee-Applicants' motion seeking dismissal of Questions 9, 11, 13, 14, and 16 is **GRANTED**; and Appellee-Applicants' motion seeking summary judgment on Questions 1, 10, 12, and 17 is **DENIED**.

This matter will proceed to a hearing on the merits of Questions 1 through 8, 10, 12, and 17. The hearing shall be scheduled pursuant to separate notice by the Court Manager. Appellee-Applicants will have the opportunity to submit, prior to the hearing, any information that may have been lacking in the application before the Planning Commission.

Done at Berlin, Vermont, this 1st day of March, 2006.

_____
Thomas S. Durkin, Environmental Judge

14